Anthony P. **PAGLIACCETTI**,
Petitioner,

v.

Superintendent John **KERESTES**,
et al., Respondents.

**Civil Action No. 11–6381.**

United States District Court,
E.D. Pennsylvania.

June 10, 2013.

Michael Wiseman, Swartmore, PA, for Petitioner.

Thomas W. Dolgenos, District Attorney's Office, David Curtis Glebe, Office of the District Attorney, Philadelphia, PA, for Respondents.

## MEMORANDUM

EDUARDO C. ROBRENO, District Judge.

Anthony Pagliaccetti ("Petitioner") is a prisoner at the State Correctional Institution—Mahanoy in Frackville, Pennsylvania. Petitioner filed an application for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 ("Habeas Petition") challenging his custody. Magistrate Judge David R. Strawbridge recommended denial of the Habeas Petition without an evidentiary hearing. Petitioner's counsel now raises two objections.[1] For the reasons that follow, the Court will adopt Magistrate Judge Strawbridge's Report and Recommendation and deny and dismiss with prejudice the habeas petition.

## I. FACTUAL BACKGROUND

Petitioner is currently serving a prison term of 15 to 30 years based on convictions for third-degree murder and related offenses. The convictions stem from a dispute occurring in the early morning hours of December 24, 2002, which resulted in Petitioner, then 19 years old, shooting and killing 19–year–old Jason McFarland ("Jason"), an acquaintance of his. Report and Recommendation ("R & R") 2, ECF No. 19.

Magistrate Judge Strawbridge succinctly summarized the facts as follows:

A dispute erupted between the two after Jason's cousin, Joseph McFarland ("Joseph"), arrived to pick him up [from a local tavern where they had been drinking,] and the conversation turned to a recent unresolved robbery of Pagliaccetti's sister of her cell phone. The Commonwealth presented evidence, through Joseph and the McFarlands' cousin, Michael Piazza ("Michael"), who was also drinking with Jason at the tavern, that Pagliaccetti grabbed Jason by his back or shoulder as they were leaving the tavern. While the argument continued outside, Joseph tried to separate Jason from Pagliaccetti and ushered Jason to his nearby car. Joseph testified that he heard gunshots as he opened the car door. He turned to see Pagliaccetti standing frozen, with a gun still pointed in the direction of Jason and himself. Jason fell to the ground, hit with one bullet to the left side of his head, which traveled from his cheek rightwards and backwards, and one bul-

---

1. Petitioner's counsel lists four separate objections, however three objections concern whether or not mischarging the jury with respect to the requirements of the defense of self-defense constituted harmless error. As such, the Court refers to Petitioner's two objections.

let in the left side of the chest, which followed a rightwards, backwards, and slightly downwards trajectory.

Pagliaccetti fled up the street and was chased by Michael. En route, he removed his red sweatshirt and stashed it, along with his gun, in a car wheel-well. Michael eventually caught him and returned him to the scene. Michael was able to identify for police where Pagliaccetti had hidden his gun. Although Michael denied at the scene and in a later police interview that he assaulted Pagliaccetti, at trial he testified that he was responsible for an injury to Pagliaccetti's left eye, punching him once in the face after Pagliaccetti initially denied to the police that he was the gunman. Another McFarland family member, Uncle Michael McFarland ("Uncle Michael"), was present at the tavern but was not called by either side to testify.

Pagliaccetti contradicted significant aspects of this account at trial. He testified that it was Joseph who raised the subject of the stolen cell phone and that Jason became verbally aggressive when Pagliaccetti inquired further. He testified that he did not leave the bar at the same time as Jason, Joseph, and Michael but stepped out shortly thereafter to make sure that Jason "got in the car alright." Pagliaccetti testified that when his cousins tried to put Jason in the car, and while Pagliaccetti was standing with their Uncle Michael near the entrance of the bar, Jason broke away and struck Pagliaccetti in the left eye. He testified that Jason then returned to the nearby car, at which point it appeared to Pagliaccetti that Jason "reached for something" in "his waistband," although Pagliaccetti admittedly did not see him draw a gun and no weapons were found on his person by police. When questioned at trial about his options, Pagliaccetti suggested that

"there was nowhere else to go" after Jason struck him because Uncle Michael was standing behind him and Jason, Joseph, and Michael were in front of him. He testified that "[i]t happened so fast" and that he did not have "time to think" when he drew his gun and fired two shots. He explained at trial that "I was in a situation where I had no choice but for what happened. I'm sorry for it." While he acknowledged his flight from the scene, he testified that he returned of his own accord and denied that any McFarland family member assaulted him after the shooting.

*Id.* at 2–4 (citations and footnotes omitted).

## II. PROCEDURAL BACKGROUND

On April 5, 2004, a jury in the Philadelphia Court of Common Pleas returned a guilty verdict on the third-degree murder charge and three weapons offenses. Habeas Pet. 4, ECF No. 1. On June 10, 2004, the court sentenced Pagliaccetti to a 15– to 30–year term of imprisonment, without any additional sentence for the weapons convictions. R & R 4. On June 24, 2004, the court denied his motion for reconsideration of the sentence. *Id.* Petitioner appealed his murder conviction to the Pennsylvania Superior Court, arguing that the conviction was based on insufficient evidence in light of his claim of self-defense. The Superior Court affirmed his conviction in an unpublished opinion on May 25, 2005. *Id.* The Pennsylvania Supreme Court denied Petitioner's request for allowance of appeal on September 21, 2005. *Id.*

On September 18, 2006, Petitioner, represented by attorney Neil E. Jokelson, collaterally attacked his convictions under the Pennsylvania Post Conviction Relief Act ("PCRA"). *Id.* at 4–5, n. 6. Petitioner filed for relief on several grounds, including ineffective assistance of trial counsel for failing to object to what Pagliaccetti

characterized as an improper jury instruction regarding self-defense. *Id.* at 5. He also alleged ineffective assistance of appellate counsel in not litigating the issue of trial counsel's ineffectiveness. *Id.* The PCRA court denied relief. *Id.* Petitioner, still represented by Mr. Jokelson, appealed to the Superior Court, claiming that he was subjected to trial court error regarding the self-defense instruction, in violation of his federal constitutional rights. *Id.* The Superior Court held that the issue of trial court error as to the jury instruction had been waived since no objection was made at trial. It further held that, in fact, there was no merit to the assertion of error as the trial court "clearly and accurately conveyed the applicable law regarding self-defense." *See Commonwealth v. Pagliaccetti*, No. 197 EDA 2009, 2010 WL 4024643, slip op. at 5–6 (Pa.Super.Ct. March 12, 2010). On October 14, 2010, the Pennsylvania Supreme Court denied Petitioner's request for allowance of appeal. R & R 5.

On October 12, 2011, Mr. Jokelson filed the instant petition on behalf of Petitioner for federal habeas relief under 28 U.S.C. § 2254. Habeas Pet. Petitioner contends that his due process rights were violated because the trial court's jury charge did not adequately convey the Commonwealth's burden of proof to overcome an assertion of self-defense to a murder charge as set forth in the applicable Pennsylvania statute. R & R 1.

On November 18, 2011, Magistrate Judge Strawbridge issued an Order to Show Cause as to why Petitioner's habeas petition should not be dismissed as untimely.[2] Order to Show Cause, Nov. 18, 2011, ECF No. 4. In a letter dated November 24, 2011, Petitioner explained that the late filing was a result of a "complete breakdown in the communications with Neil Jokelson." Ltr. from A. Pagliaccetti to Mag. J. Strawbridge, Nov. 24, 2011, ECF No. 7. Petitioner averred that Mr. Jokelson was negligent and unresponsive to his communications, and that extraordinary circumstances warranted equitable tolling of the limitations period. *Id.* Mr. Jokelson filed a separate response to the Court's Order to Show Cause on January 31, 2012, essentially supporting Petitioner's claims. Pet'r's Counsel's Resp. to Order to Show Cause, ECF No. 10. Mr. Jokelson accepted full responsibility for the late filing of the petition, and recommended that the Court grant Petitioner an evidentiary hearing on the issue of equitable tolling and appoint Petitioner independent counsel to represent him in the hearing. *Id.* at 7–8. On May 7, 2012, Petitioner filed a pro se motion for appointment of counsel for the remainder of the habeas proceedings. Mot. for Appointment of Counsel, ECF No. 15.

The Commonwealth responded to Petitioner's habeas claims, arguing that the habeas petition is time-barred under AEDPA and that equitable tolling is not warranted for this case of "garden-variety" neglect by counsel. Respondent's Answer to Pet. for Habeas Relief 3, 5, ECF No. 14. In the alternative, the Commonwealth argues that Petitioner's habeas claims are meritless because there was no error of state or federal law in the trial court's jury

**2.** Magistrate Judge Strawbridge explained, and neither Petitioner nor Mr. Jokelson dispute, that the habeas petition was untimely as per the one-year period of limitation imposed under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"). Order to Show Cause, Nov. 18, 2011, at 2. Applying 28 U.S.C. § 2244(d) to the procedural history of Pagliaccetti's state conviction yielded a deadline on or about January 18, 2011 for initiating federal habeas proceedings. R & R 6 n. 9. Thus Petitioner's filing was 267 days late. Order to Show Cause, Nov. 18, 2011, at 4.

instructions; therefore, Pagliaccetti's counsel could not be deemed ineffective for failing to raise baseless objections. *Id.* at 16.

Upon referral, Magistrate Judge Strawbridge issued a Report and Recommendation to deny the Habeas Petition on the merits. R & R 1. Judge Strawbridge also denied Petitioner's motion for appointment of counsel. *See* Order, Sept. 27, 2012, ECF No. 18. ·Petitioner's counsel of record,[3] Mr. Jokelson, filed objections on October 15, 2012. ECF No. 20. Petitioner also filed objections pro se on October 16, 2012.[4] The matter is now ripe for disposition.

## III. LEGAL STANDARD

The Court may refer an application for a writ of habeas corpus to a U.S. Magistrate Judge for a report and recommendation. Section 2254 R. 10 ("A magistrate judge may perform the duties of a district judge under these rules, as authorized under 28 U.S.C. § 636."); *see also* 28 U.S.C. § 636(b)(1)(B) (2006 & Supp. V 2011). A prisoner may object to the magistrate judge's report and recommendations within fourteen days after being served with a copy thereof. *See* 28 U.S.C. § 636(b)(1); E.D. Pa. R. 72.1(IV)(b). The Court must then "make a de novo determination of those portions of the· report or specified proposed findings or recommendations to

3. Michael Wiseman entered his appearance on behalf of Petitioner in the case on November 30, 2012. ECF No. 24. Mr. Jokelson withdrew his appearance on January 3, 2013. ECF No. 25.

4. The Government filed a motion for extension of time to file a response to Petitioner's objections on October 31, 2012. ECF No. 22. The Court granted the motion on November 1, 2012, extending the deadline for the response to December 1, 2012. ECF No. 23. The Government never filed a response.

which objection is made." 28 U.S.C. § 636(b)(1). The Court does not review general objections. *See Brown v. Astrue*, 649 F.3d 193, 195 (3d Cir.2011) ("We have provided that § 636(b)(1) requires district courts to review such objections de novo unless the objection is not timely or not specific." (internal quotation marks removed)). The Court "may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." *Id.* Therefore, the Court will conduct a de novo review of those portions of the Report and Recommendation to which Petitioner objects.

On habeas review, the Court must determine whether the state court's adjudication of the claims raised was (1) contrary to, or an unreasonable application of, clearly established federal law, or (2) based on an unreasonable determination of the facts in light of. the evidence presented. *See* 28 U.S.C. § 2254(d) (2006).

## IV. DISCUSSION

For the sake of judicial economy, Magistrate Judge Strawbridge, rather than deciding the potentially close question concerning the timeliness of Pagliaccetti's petition, proceeded to address the merits of the issue giving rise to Petitioner's due process and related ineffectiveness claims, applying a harmless error analysis.[5] R &

5. Though generally courts prefer, for reasons of judicial economy and concerns of federalism and comity, to determine whether a petition is timely before reaching its merits, in the instant case, the petition appears to be sufficiently meritless such that the Court need not pause to determine whether equitable tolling is available. *Cf. Duncan v. Walker*, 533 U.S. 167, 178, 121 S.Ct. 2120, 150 L.Ed.2d 251 (2001) (explaining that AEDPA's goal is to further interests in comity, federalism, and finality of convictions). The Court notes that neither party has objected to proceeding on the issues in this order.

R 7. Magistrate Judge Strawbridge concluded that Pagliaccetti cannot obtain relief because he was subjected only to harmless error, and therefore recommended that the Court deny Petitioner's request for an evidentiary hearing on the issue of equitable tolling of the limitations period.

■ Petitioner and his now former counsel, Neil Jokelson, have separately filed objections to Magistrate Judge Strawbridge's Report and Recommendation. Because there is no constitutional right to hybrid representation, and a district court is not obligated to consider pro se motions by represented litigants, the Court will focus on Mr. Jokelson's objections. *See McKaskle v. Wiggins,* 465 U.S. 168, 183, 104 S.Ct. 944, 79 L.Ed.2d 122 (1984); *U.S. v. D'Amario,* 328 Fed.Appx. 763, 764 (3d Cir.2009). Petitioner submitted a motion for appointment of counsel after his habeas petition was filed, but Magistrate Judge Strawbridge denied this motion on September.27, 2012. Order Denying Motion for Appointment of Counsel, Sept. 27, 2012, ECF No. 18. Mr. Jokelson did not withdraw from his representation of Petitioner until January 3, 2013, well after his objections were filed. Notice of Withdrawal of Appearance by Neil E. Jokelson, Jan. 3, 2013, ECF No. 25. The Court, therefore, considers Mr. Jokelson's objections, noting that in any case, they are consistent with and encompass all of the objections raised independently by Petitioner.

Mr. Jokelson raises two primary objections to the Report and Recommendation. First, that it was error to conclude that the due process violation of mischarging the jury with respect to the requirements of the defense of self-defense was harmless. And second, that it was error not to appoint new counsel to represent Petitioner and not to hold an evidentiary hearing on the issue of equitable tolling. Because the second objection turns on the validity of the first, the Court begins with the question of whether the incorrect jury instruction on self-defense constituted harmless error.

### A. *Effect of the Improper Jury Instruction*

Petitioner, through his counsel, objects to Judge Strawbridge's determination that the trial court's jury instruction on self-defense was erroneous, but that the error was harmless. Since neither party objects to Magistrate Judge Strawbridge's conclusion that the instructions were in error, the Court will not reiterate his analysis, but will instead turn to the question of what effect, if any, the erroneous instruction had on the jury's verdict.

#### 1. *Brecht and Strickland*

■ Petitioner seeks habeas relief on two grounds: 1) a due process violation based upon the faulty jury instructions, and 2) a derivative ineffective assistance of counsel claim. Instructional errors resulting in a due process violation are subject to a harmless error analysis. *Yohn v. Love,* 76 F.3d 508, 522 (3d Cir.1996). *Brecht v. Abrahamson* is the foundational case announcing the harmless error test. 507 U.S. 619, 113 S.Ct. 1710, 123 L.Ed.2d 353 (1993). Under *Brecht,* an error must have "had substantial and injurious effect or influence in determining the jury's verdict" for it to be considered harmful. *Id.* at 637, 113 S.Ct. 1710 (quoting *Kotteakos v. United States,* 328 U.S. 750, 776, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946)). Since *Brecht,* the Supreme Court has elaborated upon the test, holding "that in cases of grave doubt as to [the] harmlessness [of an error] the petitioner must win." *O'Neal v. McAninch,* 513 U.S. 432, 437, 115 S.Ct. 992, 130 L.Ed.2d 947 (1995). "Grave doubt" exists when, "in the judge's mind,

the matter is so evenly balanced that he feels himself in a virtual equipoise as to the harmlessness of the error." *Id.* at 435, 115 S.Ct. 992.

■■■ In conducting the harmless error inquiry, judges are to examine the impact of the error on the trial as a whole. *Yohn,* 76 F.3d at 523. "It is thus inappropriate to ask whether there was sufficient evidence to support the result, apart from the phase of the trial affected by the error. The correct inquiry is whether the error had a substantial influence on the verdict despite sufficient evidence to support the result apart from the error." *Id.*

■■■ In this case, Petitioner not only alleges that the jury instruction was constitutionally infirm, but also that counsel was ineffective for failing to object at trial. The Sixth Amendment right to counsel is the right to effective assistance of counsel. *E.g., Strickland v. Washington,* 466 U.S. 668, 686, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). To warrant reversal of a conviction, a prisoner must show (1) that his counsel's performance was deficient and (2) that the deficient performance prejudiced his defense. *See id.* at 687, 104 S.Ct. 2052; *Holland v. Horn,* 519 F.3d 107, 120 (3d Cir.2008)(citing *Strickland* ).

■■■ To prove prejudice, a convicted defendant must affirmatively prove that the alleged attorney errors "actually had an adverse effect on the defense." *Strickland,* 466 U.S. at 693, 104 S.Ct. 2052. "The defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694, 104 S.Ct. 2052.

Rather than applying the *Brecht* and *Strickland* tests separately, the Third Circuit has used the *Brecht* test to reach a conclusion regarding whether or not there has been ineffective assistance of counsel. In *Whitney v. Horn,* the petitioner brought a due process violation claim based on a faulty jury instruction and an ineffective assistance of counsel claim based on his counsel's failure to object. 280 F.3d 240, 258 (3d Cir.2002). Rather than parsing out the subtleties between the two standards, the Third Circuit held:

> [T]he ultimate issue under either test reduces to determining what effect, if any, the erroneous instruction had on the jury's verdict. Accordingly, if [the petitioner] demonstrates that the erroneous instruction had a "substantial and injurious effect or influence in determining the jury's verdict," such that it was not harmless under *Brecht,* he has also demonstrated that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."

*Id.* at 258 (quoting *Brecht,* 507 U.S. at 637, 113 S.Ct. 1710, and *Strickland,* 466 U.S. at 694, 104 S.Ct. 2052) (citations omitted). Because the instant case is analogous to *Whitney,* the Court will follow the Third Circuit and first conduct analysis under *Brecht.*

### 2. *The Trial Court's Error*

■■■ Magistrate Judge Strawbridge concluded that the jury instruction regarding self-defense that was recited at Petitioner's trial did not accurately reflect Pennsylvania law on self-defense and was materially different from the instruction to which he was entitled. R & R 16. The trial court charged the jury as follows:

> The law states that if a defendant employs deadly force to protect himself, his use of force must meet the requirements as well as the basic rule. The defendant must reasonably believe he is in immediate danger of death or serious bodily

injury from the other person, and reasonably believe it is necessary then and there to use deadly force upon that person to protect himself.

The law states that the defendant must have been free from fault in provoking or continuing the difficulty which has led to his use of deadly force, and that the defendant must have violated no duty to retreat. A defendant is at fault in provoking a difficulty if he is the initial aggressor. A defendant is at fault in continuing a difficulty if the other person, after provocation or provoking a fight, withdraws in good faith, making his peaceful intentions known, but the defendant follows and renews the fight. . . .

Because the Commonwealth has the burden of disproving the defendant's claims to self-defense, you cannot find the defendant guilty of any crime unless you're satisfied beyond a reasonable doubt that the defendant did not act in justifiable self-defense. In other words, you cannot find the defendant guilty unless you're satisfied beyond a reasonable doubt that at least one of the requirements essential to that defense is lacking.

More particularly, you cannot find the defendant guilty of any crime unless you're satisfied beyond a reasonable doubt that the defendant did not reasonable believe that he was in immediate danger of death or serious bodily injury from Jason McFarland, or that the defendant did not reasonably believe it was necessary then and there to use deadly force upon the victim—that's Jason McFarland—to protect himself, or that the defendant was not free from fault in

provoking or continuing the difficulty which led to his use of deadly force, or that the defendant violated a duty to retreat.

N.T. Apr. 2, 2004 at 73–75. Under this charge, the Commonwealth could satisfy its burden to disprove Petitioner's claim of self-defense and carry its burden to show the commission of murder if it demonstrated beyond a reasonable doubt that Petitioner "was not free from fault in provoking or continuing the difficulty which led to his use of deadly force."

Magistrate Judge Strawbridge concluded that this jury instruction was deficient because, in order for the theory of provocation to defeat the claim of self-defense, "the Commonwealth had to establish that Pagliaccetti undertook a provocative action towards Jason McFarland *with a particular intent*: an intent that it would lead either to Jason's death or to serious bodily injury." [6] R & R 20. But, as Magistrate Judge Strawbridge noted, "[the] fact that an instruction may have been in error under state law does not . . . by itself establish a basis for habeas relief." R & R 22 (citing *Estelle v. McGuire*, 502 U.S. 62, 71–72, 112 S.Ct. 475, 116 L.Ed.2d 385 (1991)).

### 3. Harmless Error Analysis

■ Magistrate Judge Strawbridge determined that under *Brecht's* harmless error analysis, habeas relief should not be granted. R & R 24. The Court agrees. In determining that the trial court's error was harmless, Magistrate Judge Strawbridge concluded that the prosecution presented sufficient evidence to defeat Petitioner's claim of self-defense by showing that Petitioner did not abide by his duty to retreat and did not hold a reasonable belief

---

**6.** In reaching this conclusion, Magistrate Judge Strawbridge primarily relied on the statutory language in 18 Pa. Cons.Stat. § 505(b)(2) (1973) and the Pennsylvania Su-

preme Court's analysis in *Commonwealth v. Samuel*, 527 Pa. 298, 590 A.2d 1245, 1248 (1991). *See* R & R 17–18.

that he was in immediate danger of death or serious bodily injury. Therefore, the erroneous jury instruction did not have "substantial and injurious effect or influence in determining the jury's verdict." *Brecht,* 507 U.S. at 637, 113 S.Ct. 1710 (quotations omitted).

As Magistrate Judge Strawbridge explained, there was significant evidence to support a finding by the jury that Petitioner could have retreated from Jason McFarland rather than employing deadly force. By Petitioner's own account, once he entered into a discussion with the four other men about who had stolen his sister's cell phone, Jason started screaming obscenities and making threats. N.T. 4/1/04 at 87. At trial, when asked what Jason was screaming about, Petitioner responded, "Why are you coming at me, dog, he said to me. I'll F you up. I'll F your girlfriend up. I'll kill 'ya both. Stuff along them lines." *Id.* Petitioner then stated that Jason's friends grabbed Jason and led him toward their car. *Id.* He said that he followed them out of the bar onto the sidewalk to check that Jason got into the car safely. *Id.* at 98. When defense counsel asked Petitioner at trial why he left the bar, he said, "Just to make sure the kid got in the car alright. He was drinking. We were all drinking. Just wanted to make sure he got home safe." *Id.* Even if the jury believed this explanation of Petitioner's actions, it seems clear that Petitioner could have retreated into the bar after Jason punched him. The prosecutor persuasively argued this point at trial: "All he had to do was walk in the bar. No one was holding him. No one

was attacking him. The person who had just punched him was 20 feet away by his own words at the car. You turn around. You walk in. That's not what he did. That's not what he did at all." N.T. 4/2/04 at 42. In short, there was substantial evidence at trial that Petitioner could have retreated from the conflict and avoided the use of deadly force.

Moreover, there was little credible evidence that Petitioner reasonably believed that Jason McFarland was about to seriously injure him when he allegedly reached for something in his waistband. As Magistrate Judge Strawbridge noted, it defies logic to argue that Jason would punch Petitioner, and then run away from him, only to pull a gun on him from a distance of twenty feet. R & R 29. Petitioner's alleged belief that Jason was reaching for a gun simply is not reasonable.

Assuming that the jury had not received erroneous instructions, and that they found that Petitioner had not provoked or continued the conflict with the intent to employ deadly force, Petitioner's claim of self-defense still would have failed. Even if the jury believed the entirety of Petitioner's testimony at trial, which seems unlikely at best,[7] there was still substantial evidence showing that he violated his duty to retreat and did not hold a reasonable belief that Jason McFarland was about to seriously injure or kill him. Under the *Brecht* test, the Court examines whether the trial error had a substantial influence on the verdict. *See supra* subsection IV.A.1. Generally, relief is only granted if "grave doubt" exists in the judge's mind as to the

---

7. The prosecutor pointed out a number of logical inconsistencies in Petitioner's testimony. For example, Petitioner testified that he shot Jason McFarland twice after being punched in the left eye. In her closing, the prosecutor asked, "If he was punched outside the bar, before he fired, how the hell, excuse me, did he fire the gun with such accuracy." N.T. 4/2/04 at 51 (arguing that Petitioner was likely punched after having shot Jason, rather than before). The prosecutor also pointed out that Jason had no injuries or scrapes on his arms or hands that would suggest that he had punched anyone. *Id.* at 52.

harmlessness of the error. *O'Neal*, 513 U.S. at 437, 115 S.Ct. 992. This standard is consistent with the principal that the writ of habeas corpus should only be granted as an extraordinary remedy. *See Brecht*, 507 U.S. at 633–34, 637–38, 113 S.Ct. 1710 (distinguishing between the "harmless beyond a reasonable doubt" standard announced in *Chapman v. California*, 386 U.S. 18, 24, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967), and the less onerous harmless error standard applied on collateral review). Given the significant evidence rebutting Petitioner's claim of self-defense, the Court has little, if any, doubt that the verdict would have been the same if the jury had been properly instructed. In failing the harmless error test applied to alleged due process violations, Petitioner also fails to establish prejudice under *Strickland*. For this reason, there is no basis for the Court to grant Petitioner his requested habeas relief.

### B. *Equitable Tolling*

Petitioner alleges that he is entitled to equitable tolling of the limitations period for his habeas petition due to extraordinary circumstances created by his former lawyer, Neil Jokelson. Having determined that Petitioner's habeas petition fails on the merits, the issue of whether the Court should hold an evidentiary hearing regarding any possible application of equitable tolling is moot.

### V. CERTIFICATE OF APPEALABILITY

The Court will not issue a Certificate of Appealability because Petitioner has not made a substantial showing of the denial of his constitutional rights. *See Slack v. McDaniel*, 529 U.S. 473, 484, 120 S.Ct. 1595, 146 L.Ed.2d 542 (2000).

### VI. CONCLUSION

For the reasons provided, the Court will approve and adopt Magistrate Judge Strawbridge's Report and Recommendation, overrule Petitioner's objections thereto, and deny the Petition for a Writ of Habeas Corpus without an evidentiary hearing. The Court will not issue a Certificate of Appealability.

### *ORDER*

AND NOW, this **10th** day of **June, 2013,** for the reasons set forth in the accompanying Memorandum Opinion, it is hereby **ORDERED** as follows:

(1) The Report and Recommendation (ECF No. 19) is **APPROVED** and **ADOPTED;**

(2) Petitioner's Objections to the Report and Recommendation (ECF Nos. 20, 21) are **OVERRULED;**

(3) The Application for a Writ of Habeas Corpus (ECF No. 1) is **DENIED** and **DISMISSED WITH PREJUDICE;**

(4) A certificate of appealability shall not issue; and

(5) The Clerk shall mark this case **CLOSED.**

**AND IT IS SO ORDERED.**

### *REPORT AND RECOMMENDATION*

DAVID R. STRAWBRIDGE, United States Magistrate Judge.

Before the Court for Report and Recommendation is the counseled petition of Anthony Pagliaccetti ("Pagliaccetti" or "Petitioner") for the issuance of a writ of habeas corpus filed pursuant to 28 U.S.C. § 2254. Pagliaccetti is currently incarcerated in the State Correctional Institution—Mahanoy serving a 15 to 30 year sentence for third-degree murder and re-

lated offenses.[1] He contends that his due process rights were violated because the trial court's jury charge did not adequately convey the Commonwealth's burden of proof to overcome an assertion of self-defense to a murder charge as set forth in the applicable Pennsylvania statute. For the reasons set out below, and notwithstanding strong concerns about the timeliness of his petition, we have concluded that this claim, as well as a derivative ineffectiveness claim, has considerable merit as to his having been subjected to error, but we recommend that it be denied given our harmless error analysis.

## I. FACTUAL AND PROCEDURAL BACKGROUND [2]

Pagliaccetti, then 19 years old, shot and killed 19-year-old Jason McFarland ("Jason"), an acquaintance of his, in the early morning hours of December 24, 2002 after they had been drinking together at a local tavern. A dispute erupted between the two after Jason's cousin, Joseph McFarland ("Joseph"), arrived to pick him up and the conversation turned to a recent unresolved robbery of Pagliaccetti's sister of her cell phone.[3] The Commonwealth presented evidence, through Joseph and the McFarlands' cousin, Michael Piazza ("Michael"), who was also drinking with Jason at the tavern, that Pagliaccetti grabbed Jason by his back or shoulder as they were leaving the tavern. While the argument continued outside, Joseph tried to separate Jason from Pagliaccetti and ushered Jason to his nearby car. Joseph testified that he heard gunshots as he opened the car door. He turned to see Pagliaccetti standing frozen, with a gun still pointed in the direction of Jason and himself. (N.T. 3/31/04 at 32–49.) Jason fell to the ground, hit with one bullet to the left side of his head, which traveled from his cheek rightwards and backwards, and one bullet in the left side of the chest, which followed a rightwards, backwards, and slightly downward trajectory. (N.T. 3/31/04 at 79, 83 (testimony of medical examiner).)

Pagliaccetti fled up the street and was chased by Michael. En route, he removed his red sweatshirt and stashed it, along with his gun, in a car wheel-well. Michael eventually caught him and returned him to the scene. Michael was able to identify for police where Pagliaccetti had hidden his gun. Although Michael denied at the scene and in a later police interview that he assaulted Pagliaccetti, at trial he testified that he was responsible for an injury to Pagliaccetti's left eye, punching him once in the face after Pagliaccetti initially denied to the police that he was the gunman. (N.T. 4/1/04 at 3–17.) Another McFarland family member, Uncle Michael McFarland ("Uncle Michael"), was present at the tavern but was not called by either side to testify.

Pagliaccetti contradicted significant aspects of this account at trial. He testified that it was Joseph who raised the subject

1. We note that while the institution where Petitioner is confined is in Schuylkill County and within the Middle District of Pennsylvania, see 28 U.S.C. § 118(b), venue is proper here in that his confinement grew out of a prosecution and conviction within the Eastern District of Pennsylvania. See 28 U.S.C. § 2241(d).

2. For simplicity, and meaning no disrespect by over-familiarity, we will refer to the victim and his relatives by their first names and familial relationship.

3. Although Pagliaccetti apparently did not suspect the McFarlands of involvement in the crime, he appeared to Joseph to believe that the thief was someone from their neighborhood and that they were shielding the perpetrator. (See N.T. 3/31/04 at 37–38. See also N.T. 4/1/04 at 93.)

of the stolen cell phone and that Jason became verbally aggressive when Pagliaccetti inquired further. He testified that he did not leave the bar at the same time as Jason, Joseph, and Michael but stepped out shortly thereafter to make sure that Jason "got in the car alright." (N.T. 4/1/04 at 98.)[4] Pagliaccetti testified that when his cousins tried to put Jason in the car, and while Pagliaccetti was standing with their Uncle Michael near the entrance of the bar, Jason broke away and struck Pagliaccetti in the left eye. He testified that Jason then returned to the nearby car, at which point it appeared to Pagliaccetti that Jason "reached for something" in "his waistband," although Pagliaccetti admittedly did not see him draw a gun and no weapons were found on his person by police. (N.T. 4/1/04 at 88, 102, 105.) When questioned at trial about his options, Pagliaccetti suggested that "there was nowhere else to go" after Jason struck him because Uncle Michael was standing behind him and Jason, Joseph, and Michael were in front of him. He testified that "[i]t happened so fast" and that he did not have "time to think" when he drew his gun and fired two shots. (Id. at 88, 104.) He explained at trial that: "I was in a situation where I had no choice but for what happened. I'm sorry for it." (Id. at 107.) While he acknowledged his flight from the scene, he testified that he returned of his own accord and denied that any McFarland family member assaulted him after the shooting. (See generally N.T. 4/1/04 at 79–109.)

At the defense's request and in light of Pagliaccetti's testimony that he shot the victim out of fear for his own safety, the court provided a jury instruction on self-defense. The jury did not, however, find Pagliaccetti's shooting of Jason to be justified and, on April 5, 2004, it returned a verdict of guilt as to third-degree murder, in addition to weapons offenses. The court sentenced Pagliaccetti on June 10, 2004 to a term of imprisonment of 15 to 30 years, imposing no additional sentence for the weapons convictions. On June 24, 2004, the court denied his motion for reconsideration of the sentence.[5] Represented by new counsel on direct appeal, Pagliaccetti challenged, inter alia, the sufficiency of the evidence to sustain the murder conviction in light of his claim of self-defense. He did not, however, raise any challenge to the instruction given by the trial court to the jury on this point. The Pennsylvania Superior Court found sufficient evidence in the record and affirmed his conviction in an unpublished opinion on May 25, 2005. The Pennsylvania Supreme Court denied his petition for allowance of appeal on September 21, 2005.

Pagliaccetti did not initiate any further action seeking review of his conviction until nearly a year later, when attorney Neil E. Jokelson, Esquire, filed a petition on his behalf seeking relief in the state court pursuant to Pennsylvania's Post Conviction Relief Act ("PCRA"), 42 Pa. Cons.Stat.

---

4. Jason's blood alcohol content was found to be .39% when tested in the course of the medical examiner's autopsy.

5. In explaining his decision to deny the motion for reconsideration in this case with which he was "very familiar," Judge Lineberger remarked to the defense: "I think you did a magnificent job getting the jury, under the circumstances, to bring, obviously murder one, which would be a life sentence, to a murder three, and then a murder three to 15 to 30 is a miracle." (N.T. 6/24/04 at 6–7.) He also suggested that the notion that the two shots fired by Pagliaccetti could have struck the victim in the head and chest by luck was unlikely and that, "[h]ad the jury not deviated, this was a specific intent to kill, circumstantial evidence arguably, a specific intent to kill." (Id. at 6.)

§§ 9541–9546.[6] The petition was assigned to the Honorable Renee Cardwell Hughes due to the retirement of the trial judge, the Honorable James A. Lineberger. Pagliaccetti sought relief on several grounds, including ineffective assistance of trial counsel for failing to object to what Pagliaccetti characterized as an improper jury instruction regarding self-defense. He also alleged ineffective assistance of appellate counsel in not litigating the issue of trial counsel's ineffectiveness.

The PCRA Court denied relief. Still represented by Attorney Jokelson, Pagliaccetti appealed to the Superior Court, this time asserting that he was subjected to trial court error regarding the self-defense instruction, in violation of his federal constitutional rights.[7] *See Commonwealth v. Pagliaccetti*, No. 197 EDA 2009, 2010 WL 4024643, slip opin. at 3 (Pa.Super.Ct. Mar. 12, 2010). The Superior Court agreed with the PCRA Court that the issue of trial court error as to the instruction had been waived because no objection was made at trial. It further found that the waiver could not be excused as having been caused by ineffectiveness of counsel. Rather, the court found no merit to the assertion of error as to the jury instruction and concluded instead that the trial court "clearly and accurately conveyed the applicable law regarding self-defense." *Id.* at 5–6. The Pennsylvania Supreme Court denied the Petition for Allowance of Appeal on October 14, 2010.

Attorney Jokelson filed Petitioner's counseled petition for a federal writ of habeas corpus on October 12, 2011. (Doc. No. 1.)[8] After it was referred to us for a Report and Recommendation on November 17, 2011, we issued an Order to Show Cause why the petition should not be dismissed as untimely under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), which imposed a one-year period of limitation for the filing of an application of a writ of habeas corpus. (Order to Show Cause, Nov. 18, 2011 [Doc. No. 4].)[9] Pagliaccetti responded in a letter dated November 24, 2011, indicating that the late filing reflected Jokelson's negligence and contending that Jokelson had been unresponsive to Pagliaccetti's numerous attempts to contact him regarding his case. (Ltr. from A. Pagliaccetti to Mag. Judge Strawbridge, Nov. 24, 2011 [Doc.

---

6. A verification appended to the counseled petition appears to have been signed by Pagliaccetti on June 1, 2006, but an appended affidavit of a putative witness that was also appended to the petition is dated August 29, 2006. Counsel filed the petition on September 18, 2006.

7. Petitioner also asserted that the PCRA Court erred in its characterization of his ineffective assistance of counsel claim concerning the jury charge as a "boiler plate" allegation, presumably meant to resurrect the claim of trial court error to which no objection was made at the time of trial. The Superior Court found this issue to be moot in light of its resolution of the claim involving the merits of the underlying trial court error claim.

8. Given that it was counseled, the petition need not have been signed by Pagliaccetti, but he later submitted a signature page for the petition. *See* Doc. No. 2.

9. As set out in the show cause order, the application of 28 U.S.C. § 2244(d) to the procedural history of Pagliaccetti's state conviction yielded a deadline on or about January 18, 2011 for initiating federal habeas proceedings. In response to a question on the petition form, Pagliaccetti indicated his belief that his petition was timely because it was being filed within one year of the Pennsylvania Supreme Court's denial of allocatur. (Doc. No. 1 at ECF p. 22.) This interpretation of § 2244(d) failed to account for the portion of the limitations period that had elapsed pursuant to subsection (d)(1)(A) prior to the initiation of state post-conviction collateral proceedings under the PCRA, e.g., the period from December 20, 2005 to September 18, 2006.

No. 7].) He requested that the Court consider equitable tolling of the limitations period. Jokelson filed a response requesting this as well and suggesting that new counsel be appointed to allow Petitioner to develop this issue. (Petr's Counsel's Resp. to Order to Show Cause [Doc. No. 10].) Respondents filed an answer to the petition asserting that Pagliaccetti's petition is time-barred under AEDPA and that equitable tolling is not warranted for this case of "garden-variety" neglect by counsel. Respondents also assert, in the alternative, that the petition should be denied because his claims are without merit. (Ans., Doc. No. 14.) Petitioner has filed a motion for the appointment of new counsel in light of a breakdown in communication with Jokelson and his perceived need for the development of a record warranting equitable tolling. (Mot. for Appointment of Counsel, Doc. No. 15.)

## II. DISCUSSION

As is evident from this Court's initial order upon referral of this matter for a Report and Recommendation, Pagliaccetti's petition raises a timeliness concern. As we set forth in greater detail below, while we have identified the problem, we have determined that resolution of this issue would likely give rise to the question of the necessity for an evidentiary hearing to determine whether any period of equitable tolling would render the petition timely. Under the circumstances of this case, an evidentiary hearing would also require that Pagliaccetti have the assistance of new counsel, possibly at the government's expense. In the interest of judicial economy, therefore, after identifying the potentially close question concerning timeliness,

we proceed to address the merits of the issue that gives rise to Petitioner's due process and related ineffectiveness claims, including a harmless error analysis.[10]

### A. Timeliness

The AEDPA imposed a one-year period of limitations for the filing of an application for a writ of habeas corpus. The statute provides:

(1) A 1–year period of limitation shall apply to an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court. The limitation period shall run from the latest of—

(A) the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review;

(B) the date on which the impediment to filing an application created by State action in violation of the Constitution or law of the United States is removed, if the applicant was prevented from filing by such state action;

(C) The date on which the constitutional right asserted was initially recognized by the Supreme Court, if the right has been newly recognized by the Supreme Court and made retroactively applicable to cases on collateral review; or

(D) the date on which the factual predicate of the claim or claims presented could have been discovered through the exercise of due diligence.

(2) The time during which a properly filed application for State post-conviction or other collateral review with respect to the pertinent judgment or claim is pend-

---

**10.** Inasmuch as we conclude that Pagliaccetti cannot obtain relief because he was subjected to only harmless error, and assuming *arguendo* that he could have established that his petition was timely, we conclude that the in-

terests of justice do not require that new counsel be appointed to further develop the merit of the claims presented in the counseled petition before the court.

ing shall not be counted toward any period of limitation under this subsection.

28 U.S.C. § 2244(d).

In our Order to Show Cause, we explained that based upon the information provided in his petition, Pagliaccetti's judgment became final on December 20, 2005, when the 90-day period in which he could seek certiorari in the United States Supreme Court expired, pursuant to subsection (1)(A). (Order to Show Cause, Nov. 18, 2011, at 3). By the time Petitioner filed his counseled PCRA petition on September 18, 2006, 272 days of the one-year (365-day) federal limitations period pursuant to AEDPA had already elapsed, and only 93 days remained. (*Id.*) The federal limitations period was tolled during the pendency of Petitioner's properly filed state PCRA petition and resumed on October 15, 2010, when the Pennsylvania Supreme Court denied allowance of appeal of the Superior Court's decision. (*Id.* at 4.) The limitations period expired on January 18, 2011, 93 days after the denial of allowance of appeal. Petitioner did not file his petition until October 12, 2011—some 267 days later. (*Id.*)

In response to our Order to Show Cause, Petitioner and his counsel each suggested that the Court should hold an evidentiary hearing to permit Pagliaccetti to attempt to establish a basis for equitable tolling of the limitations period as to render his petition timely. (*See* Doc. No. 7 & Doc. No. 10.)[11] The United States Supreme Court recognizes that the AEDPA statute of limitations is subject to equitable tolling but that such tolling is appropriate only where extraordinary circumstances prevented the petitioner from filing on time and where the petitioner pursued his

rights diligently. *Holland v. Florida,* 560 U.S. 631, 130 S.Ct. 2549, 2560–62, 177 L.Ed.2d 130 (2010). The Supreme Court warned that a "garden variety claim of excusable neglect" does not constitute an extraordinary circumstance warranting equitable tolling. *Id.* at 2564. *See also Johnson v. Hendricks,* 314 F.3d 159 (3d Cir.2002) (holding petitioner was "not prevented in an extraordinary way from asserting his rights" warranting equitable tolling in a non-capital case where petitioner received and relied upon attorney's erroneous advice regarding the date by which he would have to file his *pro se* habeas petition).

In his letter response to this Court's show cause order, Petitioner explained that he has had trouble communicating with Jokelson and has kept a log of all of his attempts to contact him, as well as attempts made by various family members. (Ltr. from A. Pagliaccetti to Mag. Judge Strawbridge, Nov. 24, 2011 [Doc. No. 7].) He accused Jokelson of intentionally sabotaging his petition and of refusing to take certain steps in the development of his case that he felt were necessary, creating a "fundamental miscarriage of justice." (*Id.*) Petitioner then requested an evidentiary hearing which would provide him the opportunity to "identify egregious misconduct, alternative extraordinary circumstances, and key components of diligence" required to satisfy the requirements of *Holland.* (*Id.*) For his part, Jokelson responded that "[a]ny inappropriate filing of Pagliaccetti's habeas petition is without fault on the part of Pagliaccetti and was the full and complete responsibility of Pagliaccetti's counsel." (Doc. No. 10 at 4.) Jokelson suggests that the Court conduct an evidentiary hearing regarding equitable

---

**11.** Petitioner does not challenge our interpretation of the calculation of the limitations period pursuant to 28 U.S.C. § 2244(d).

tolling and supply Pagliaccetti with independent counsel. (*Id.* at 9.)

We are not convinced that the evidence proffered by Petitioner would be sufficient to warrant equitable tolling. Petitioner makes certain assertions consistent with what the Supreme Court suggested in *Holland* could qualify as extraordinary circumstances, but other aspects of the circumstances suggest that his situation is one which is consistently held *not* to be extraordinary *See, e.g., Holland*, 130 S.Ct. at 2564 (quoting *Lawrence v. Florida*, 549 U.S. 327, 336, 127 S.Ct. 1079, 166 L.Ed.2d 924 (2007) for the proposition that "a simple miscalculation that leads a lawyer to miss a filing deadline 'does not warrant equitable tolling' "). We also detect some inconsistencies even in Pagliaccetti's submissions attempting to articulate acceptable excuses for his late filing, including his suggestion—important in *Holland*—that he was kept in the dark by counsel as to the conclusion of the state post-conviction process, which suggest that he is shading facts for purposes of the equitable tolling consideration.[12]

We appreciate that Pagliaccetti has sought a hearing at which he suggests he would offer further documentation supporting his request for equitable tolling and for which he seeks the appointment of counsel. His written response to the show cause order, however, does not make any proffer of diligence, nor does it suggest that he could make such a proffer, other than to offer that he repeatedly attempted to contact the attorney whom he apparently already believed to be negligent based upon his experience and that of his family. *See, e.g.,* Ltr. from A. Pagliaccetti to Mag.

Judge Strawbridge, Nov. 24, 2011 [Doc. No. 7], at 1 (referring to "proof" he has of Jokelson's "pattern practice [sic] in three (3) cases he is representing for Our Family" in which the cases "were filed on the heels of their deadline, or statute of limitation"); *id.* (referring to complete breakdown in communications with counsel "for some time"). If Pagliaccetti was truly concerned regarding Jokelson's stewardship and what seemed to be protracted delay in the adjudication of allocatur petition of the Pennsylvania Supreme Court on PCRA review, we would have expected him to contact the state court to inquire. *Cf. Holland*, 130 S.Ct. at 2565 (remanding for consideration of equitable tolling where petitioner "repeatedly contacted the state courts, their clerks, and the Florida State Bar Association in an effort to have [his attorney] removed from his case"). *See also id.* at 2568 (Alito, J., concurring) (noting allegation that petitioner made reasonable efforts to terminate counsel and observing that petitioner prepared *pro se* 2254 petition as soon as he learned that state process had concluded and petition was overdue); *id.* at 2573 (Scalia, J., dissenting) (arguing that petitioner should not have been caught off-guard by attorney's non-responsiveness given failure to respond to requests for information even before the state post-conviction process concluded, giving him "greater reason to suspect that [counsel] had fallen asleep at the switch"). Pagliaccetti offers no proffer that he made any inquiry of anyone between the time Jokelson sought allocatur on his behalf, in April 12, 2010, and when Pagliaccetti affixed his signature to the federal habeas petition on October 13, 2011.

---

**12.** For example, Pagliaccetti contends that he never knew that his PCRA proceedings had concluded when his § 2254 petition was filed. Yet, he signed a signature page for his petition attesting to the truthfulness of the petition—which included references in the form and in the attachments to the denial by the Pennsylvania Supreme Court of his PCRA appeal.

We may perhaps have been inclined to provide Pagliaccetti an opportunity to develop the record in this regard with new counsel before conclusively ruling out equitable tolling had there appeared a likelihood of relief on the merits of his petition. It would be an inefficient use of this Court's resources, however, to further explore the timeliness question through an evidentiary hearing where there is a purely legal issue implicated by Pagliaccetti's petition and one that is ripe for review in its present state, which is whether the trial court erred in its instruction to the jury on self-defense and, if so, whether the circumstances of the case as a whole establish that the error was not harmless. We therefore proceed to address that claim.

## B. Petitioner's claim on the merits

Petitioner's principal claim is that the trial court failed to provide proper instructions to the jury regarding the interplay between provocation by the defendant and the aggression by the victim that caused the defendant to respond with deadly force. Because the Commonwealth shouldered the burden of proof that self-defense was not warranted, the issue raises the question as to whether error in the instruction effectively relieved the Commonwealth of its burden of proof on one of the essential components of the offense.

Petitioner raised this claim on PCRA review, albeit slightly inconsistently, in that his PCRA petition presented the claim only as one of ineffective assistance of counsel for failure to raise this issue at trial or on appeal, while his brief on appeal to the Superior Court presented it only as a claim of trial court error. The Superior Court found the claim of trial court error to have been waived due to the failure of trial counsel to have made a contemporaneous objection at the time of trial, yet it also addressed the merits of this claim in light of Petitioner's additional contention that the waiver of the claim was caused by ineffective assistance of counsel at trial. The Superior Court concluded that the charge given was not incorrect under prior state cases that had interpreted the statute and therefore that the trial court did not err in giving the instruction it did. We find the issue presented to be a bit more complex than the Superior Court suggests, as we set forth below.[13]

### 1. The charge given

Analysis of this claim requires careful attention to the language of the governing statute as well as the instruction that was given in Pagliaccetti's trial and which, apparently, was commonly given in Pennsylvania state courts in cases in which the defendant raised self-defense. See, e.g., Pa. Std. Suggested Crim. Jury Instr. 9–

---

13. As is apparent from the analysis that follows, we do not agree with Respondents that "the Superior Court's finding during PCRA review that the trial court did *not* err as a matter of state law with respect to the instruction on self defense is effectively unassailable in this Court" and that "such state-level decisions are *conclusively binding* upon the federal courts." (Ans. at 14–15 (italics in original).) Rather, "[i]t is well established that the fundamental fairness guarantee of the Due Process Clause requires the prosecution to prove beyond a reasonable doubt every element of the offense." *Estelle v. McGuire,* 502 U.S. 62, 78, 112 S.Ct. 475, 116 L.Ed.2d 385

(1991) (O'Connor, J., concurring and dissenting) (citing *In re Winship,* 397 U.S. 358, 364, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970), and *McMillan v. Pennsylvania,* 477 U.S. 79, 85, 106 S.Ct. 2411, 91 L.Ed.2d 67 (1986)). Petitioner's challenge raises the question of whether the charge given to the jury in his case reasonably conveyed the nature of the Commonwealth's burden of proof such that it can be presumed that the jury did, in fact, find that the Commonwealth proved beyond a reasonable doubt each element of third-degree murder for which Petitioner was convicted.

505 (1979).[14] Following upon a charging conference with counsel at which Petitioner's attorney requested that the jury be charged regarding self-defense—but which did not otherwise touch upon the language of the charge to be given—the trial court instructed the jury as follows:

> The defendant claims that he shot Mr. McFarland in self-defense. Self-defense, if justifiable, is a complete defense to the charge. The Commonwealth has the burden of proving beyond a reasonable doubt that the defendant did not act in justifiable self-defense. [[15]]
>
> Now, there are two rules of self-defense, and I'm going to give you the basic rule first. The basic rule for self-defense is that a defendant is justified in using force against another person if he reasonably believes he is in immediate danger of unlawful force from that person, and reasonably believes it is necessary then and there to use the force which he does use to protect himself.
>
> It's important that you note that a defendant's right to self-defense depends upon what he reasonably believes. Thus, the right of self-defense may be available not only to a person who is in actual danger of unlawful attack but also to one who mistakenly believed he is. A defendant is entitled to estimate the necessity for the force he employ[s] under circumstances as he reasonably believes them to be at the time. In the heat of a conflict a person who is being attacked ordinarily has neither time nor

composure to evaluate carefully the danger, and make nice judgments about exactly how much force is needed to protect himself. Be realistic. Consider the limitations of human nature when judging what the defendant believed, and whether his belief is reasonable.

> Now, that's the general law with regard to self-defense. The other requirements for justifiable self-defense besides those in the basic rule are more restrictive if the defendant uses deadly force to protect himself than if he uses non-deadly force. In other words, if it's deadly force then the criteria is different. And here it is for deadly force.
>
> Deadly force is force which, under the circumstances in which is it used, is readily capable of causing death or serious bodily injury. Quote, serious bodily injury, ladies and gentlemen, is bodily injury which creates a substantial risk of death, or which causes serious, permanent disfigurement, or protracted loss or impairment of the function of any bodily member or organ.
>
> According to my definition, force is not deadly force simply because it happens to kill or seriously injure. For example, a slap in the face which is freakish and unexpectedly leads to death is not deadly force. Deadly force has to be force which, under the circumstances is which it is used, is readily capable of causing death or serous bodily injury.

**14.** This instruction was significantly revised in the second edition of the standard jury instructions that were published in 2005, a year after Pagliaccetti's trial. The revised standard instructions tracks the wording of the statute concerning provocation, describing the elements of this aspect of self-defense in accordance with how Petitioner contends the jury should have been charged in his case.

**15.** With the enactment of the Crimes Code, 18 Pa. Cons.Stat. §§ 101–7504 (1973), Pennsylvania shifted the burden of proof as to several defenses—including self-defense—from the defendant to the Commonwealth. *See generally* Sheldon S. Toll, *A Practitioner's Guide to Defenses Under the New Pennsylvania Crimes Code*, 12 Duq. L.Rev. 842, 853 (1973–74), *avail. through* HeinOnline (addressing burden of proof of statutory defenses; author was the Reporter for the Pennsylvania Crimes Code).

*The law states that if a defendant employs deadly force to protect himself, his use of force must meet the requirements as well as the basic rule. The defendant must reasonably believe he is in immediate danger of death or serious bodily injury from the other person, and reasonably believe it is necessary then and there to use deadly force upon that person to protect himself.*

**The law states that the defendant must have been free from fault in provoking or continuing the difficulty which has led to his use of deadly force,** *and that the defendant must have violated no duty to retreat.* **A defendant is at fault in provoking a difficulty if he is the initial aggressor. A defendant is at fault in continuing a difficulty if the other person, after provocation or provoking a fight, withdraws in good faith, making his peaceful intentions known, but the defendant follows and renews the fight.**

The law states that even if the defendant is the initial aggressor, if he has withdrawn in good faith, making his peaceful intentions known, but the other person follows and renews the fight, or if he uses non-deadly force but the other person responds with force which is excessive and deadly, the defendant is no longer the aggressor. His fault in provoking the difficulty is overlooked, and his right to self-defense is restored.

As a general rule, a defendant has a duty to retreat before resorting to deadly force in self-defense if he knows he can avoid the necessity of using the force with complete safety by retreating. However, if the encounter takes place within the defendant's own dwelling, then he has no duty to retreat unless he was the initial aggressor.

*Because the Commonwealth has the burden of disproving the defendant's claims to self-defense, you cannot find the defendant guilty of any crime unless you're satisfied beyond a reasonable doubt that the defendant did not act in justifiable self-defense. In other words, you cannot find the defendant guilty unless you're satisfied beyond a reasonable doubt that at least one of the requirements essential to that defense is lacking.*

*More particularly, you cannot find the defendant guilty of any crime unless you're satisfied beyond a reasonable doubt that [1] the defendant did not reasonably believe that he was in immediate danger of death or seriously bodily injury from Jason McFarland, or [2] that the defendant did not reasonably believe it was necessary then and there to use deadly force upon the victim— that's Jason McFarland—to protect himself,* **or [3] that the defendant was not free from fault in provoking or continuing the difficulty which led to his use of deadly force,** *or [4] that the defendant violated a duty to retreat.*

(N.T. Apr. 2, 2004 at 71–75 (all emphasis and numbering added).) Thus, according to the charge given, the Commonwealth could satisfy its burden to disprove Pagliaccetti's claim to self-defense and carry its burden to show the commission of murder if, *inter alia*, it demonstrated beyond a reasonable doubt that Pagliaccetti "was not free from fault in provoking or continuing the difficulty" that ultimately concluded with his shooting McFarland.

Petitioner contends that this charge did not reflect Pennsylvania law on self-defense and that the deviation between the instruction to which he was entitled and the one given is material, violating his right to due process.

### 2. Pennsylvania law on self-defense

Effective June 6, 1973, Pennsylvania enacted statutory definitions to many of the

defenses that had been available at common law. Section 503 of the State's Crimes Code addresses the notion of justification generally, and Section 505 sets out the requirements for a defense of self-defense. Subsection (a) provides, as to the "[u]se of force justifiable for protection of the person" that: "The use of force upon or toward another person is justifiable when the actor believes that such force is immediately necessary for the purpose of protecting himself against the use of unlawful force by such other person on the present occasion." 18 Pa. Cons.Stat. § 505(a). The next subsection addresses the "[l]imitations on justifying necessity for use of force" and addresses the castle doctrine as well as circumstances involving the use of force incident to an arrest. Pertinent to Pagliaccetti's case and his use of deadly force, however, Section 505(b)(2) addresses the question of provocation and the restriction that the defendant's acts of provocation may place upon his entitlement to the justification defense:

> (2) The use of deadly force is not justifiable under this section unless the actor believes that such force is necessary to protect himself against death, serious bodily injury, kidnapping or sexual intercourse compelled by force or threat; *nor is it justifiable if:*
>
> *(i) the actor,* **with the intent of causing death or serious bodily injury,** *provoked the use of force against himself in the same encounter;* or
>
> (ii) the actor knows that he can avoid the necessity of using such force with complete safety by retreating or by surrendering possession of a thing to a person asserted a claim of right thereto or by complying with a demand that he abstain from any action which he has no

duty to take, [except as might be justified pursuant to castle doctrine or in the case of a public officer performing his duties].

18 Pa. Cons.Stat. § 505(b)(2) (1973) (emphasis added).[16] As the Pennsylvania Supreme Court noted in 1991 in *Commonwealth v. Samuel,* "in order to find that the defendant had forfeited his right to self-defense pursuant to the doctrine of provocation, the facts must support the statutory requirement that the defendant, with the *intent of causing death or serious bodily injury,* provoked the use of force." *Commonwealth v. Samuel,* 527 Pa. 298, 590 A.2d 1245, 1248 (Pa.1991) (emphasis in original). *See also id.* (noting, in case challenging the sufficiency of evidence supporting the conviction, that "the meaning of the statute is clear. In order to establish that an actor was the aggressor or provoker and, hence, was not entitled to claim a defense of self-defense or defense of others, there must be some evidence to support the inference that the defendant's acts constituted 'an intent to cause death or serious bodily injury.' "). *But see also id.* at 1247–48 (stating earlier in opinion that, in order to "prevail" on a theory of self-defense, "the defendant must establish" that "(a) he reasonably believed that he was in imminent danger of death or serious bodily injury and that it was necessary to use deadly force against the victim to prevent such harm; (b) that the defendant was free from fault in provoking the difficulty which culminated in the slaying; and (c) that the actor did not violate any duty to retreat"). When a revised version of the standard criminal instructions was published in 2005, the model instruction concerning self-defense was modified, replacing the "free from fault" language with

---

**16.** The 1973 version of the statute was in effect at the time of Pagliaccetti's trial. It was most recently amended in 2011.

the notion that the Commonwealth must prove that the defendant "engaged in conduct that demonstrated his intent to cause death or serious bodily injury" and that "by that conduct, he provoked the use of force against him." *See* Pa. Std. Sugg. Crim. Jury Instr. § 9.501. The Advisory Committee Note accompanying this standard instruction reflects that the Committee looked to the Pennsylvania Supreme Court decision in the *Samuel* decision for guidance on the nature of the defendant's acts of provocation to defeat his counter-use of force.

### 3. Pagliaccetti's assertion of trial court error

In his 2006 PCRA petition, Pagliaccetti presented to the state court his contention that the charge given at his 2004 trial violated, *inter alia*, his due process right because it misstated the law and failed to require that the jury find his actions justified if the Commonwealth could not prove beyond a reasonable doubt, *inter alia*, that Pagliaccetti provoked McFarland to display unlawful force against him and that Pagliaccetti did so with the intent of causing death or serious bodily injury to McFarland. He distinguished this from the charge that required the Commonwealth to prove only that Pagliaccetti "provok[ed] or continu[ed] the difficulty which led to his use of deadly force," which lacked any intent requirement.

In explaining its decision to dismiss the petition, the PCRA Court took the position that it was "well settled law that the absence of the limiting language—'with the intent to cause death or serious bodily injury' which is missing from this trial court's instruction—does not render the instruction inadequate." *Commonwealth v. Pagliaccetti*, No. CP–51–CR–2029511–2003, 2010 WL 4024643, slip opin. at 3 [St. Ct. Rec. D14] (citing *Commonwealth v. Alvin*, 357 Pa.Super. 509, 516 A.2d 376

(Pa.Super.Ct.1986); *Commonwealth v. Minh La*, 433 Pa.Super. 432, 640 A.2d 1336 (Pa.Super.Ct.1994); *Commonwealth v. Serge*, 837 A.2d 1255 (Pa.Super.Ct.1003); and *Commonwealth v. Bracey*, 568 Pa. 264, 795 A.2d 935 (Pa.2001)). The court held that "although the language used by the trial court was slightly inconsistent with the statute," it nonetheless accurately reflected "the law" on self-defense and therefore concluded that the erroneous instruction claim, and by extension the ineffective counsel claim, failed. *Id.* at 3–4, 795 A.2d 935. *See also id.* at 4, 795 A.2d 935 ("No fault can be found with the trial court's charge on self defense.").

On appeal, the Superior Court agreed that Pagliaccetti had waived any claim regarding the jury instructions due to counsel's failure to have raised an objection at trial. It nonetheless proceeded to analyze the instructions for error, recognizing that Pagliaccetti believed the instructions given misstated the law and were "at material variance with 18 Pa.C.S.A. § 505(b)(2)(i) and, accordingly, violated his constitutional rights." *Commonwealth v. Pagliaccetti*, No. 197 EDA 2009, 2010 WL 4024643, slip opin. at 4 (Pa.Super.Ct. Mar. 12, 2010). The court found that his claim was "devoid of merit." *Id.* 2010 WL 4024643 at 6. Looking at the instructions as a whole and relying upon its own precedent, *Commonwealth v. Alvin*, 357 Pa.Super. 509, 516 A.2d 376 (Pa.Super.Ct.1986), *appeal denied*, 515 Pa. 603, 529 A.2d 1078 (Pa.1987), the court concluded that the jury instructions as a whole "accurately conveyed the applicable law regarding self-defense." *Pagliaccetti*, 2010 WL 4024643, slip opin. at 6. We find this proposition difficult to accept.

The Superior Court's analysis of the jury charge issue presented to it by Pagliaccetti on PCRA review failed to take into account his due process right not necessar-

ily to an instruction that quoted the Crimes Code verbatim, but rather to one that accurately conveyed the Commonwealth's burden to overcome his assertion on self-defense. As to the theory of provocation to defeat the claim of self-defense, it is clear to us that the instruction was deficient for its failure to convey that the Commonwealth had to establish that Pagliaccetti undertook a provocative action towards Jason McFarland *with a particular intent:* an intent that it would lead either to Jason's death or to serious bodily injury. Otherwise, the Commonwealth had to establish one of two other prongs: (1) that Pagliaccetti did not actually or reasonably believe that deadly force was necessary due to an immediate danger of Jason McFarland causing him death or serious bodily injury; or (2) that Pagliaccetti knew of an avenue of retreat but failed to avail himself of it.

We find merit in Pagliaccetti's argument and conclude that the trial court erred in instructing the jury that the Commonwealth could overcome Pagliaccetti's assertion of self-defense if the jury was satisfied beyond a reasonable doubt merely that "the defendant was not free from fault in provoking or continuing the difficulty which led to his use of deadly force." (N.T. 4/2/04 at 75.) While the Superior Court may have found its interpretation consistent with its own precedent, it failed to account for the Pennsylvania Supreme Court's recognition in the 1991 *Samuel* case that, "in order to find that the defendant had forfeited his right to self-defense pursuant to the doctrine of provocation, the facts must support the statutory requirement that the defendant, with the *intent of causing death or serious bodily injury,* provoked the use of force," *Commonwealth v. Samuel,* 527 Pa. 298, 590 A.2d 1245, 1248 (Pa.1991) (emphasis in original). The jury in Pagliaccetti's trial was most surely not asked to assess the evidence in this light. We cannot agree either with the trial court, the PCRA Court, or the Superior Court that the "free from fault" construction of this element fairly conveys the essential "provoking the use of force with the intent of causing death or serious bodily injury" element. Contrary to the state court, we conclude that the "free from fault" jury instruction was erroneous in that it did not comport with Pagliaccetti's due process right that the jury be given proper instruction concerning the necessity that the Commonwealth prove his guilt beyond a reasonable doubt in light of his claim of self-defense as set forth in the statute and as recognized by the state supreme court in *Samuel.*[17]

**17.** This issue appears to have arisen twice before in a habeas petition adjudicated in this district and reported by Westlaw. Among several other claims, the petitioner in *Lecount v. Patrick,* No. Civ. 02–3734, 2006 WL 2540800 (E.D.Pa. Aug. 30, 2006) (Giles, J.), asserted that the state trial court erred in failing to instruct the jury that before the Commonwealth could establish provocation on his part and foreclose his reliance upon a theory of self-defense, it had to show that he acted with intent to cause death or serious bodily injury. While the trial court had instructed the jury that LeCount had no obligation to prove anything in regard to self-defense and that it was the Commonwealth's burden to disprove self-defense beyond a rea-sonable doubt, it instructed the jury that the Commonwealth could satisfy that burden if it proved that LeCount was "free from fault in provoking or continuing the dispute." *Lecount,* 2006 WL 2540800 at *17 (R & R of Scuderi, M.J.). The state court also noted that the Superior Court, in *Commonwealth v. Alvin,* 357 Pa.Super. 509, 516 A.2d 376 (Pa.Super.Ct.1986), had specifically rejected the claim that a trial court was required to use the precise statutory language of 18 Pa. Cons.Stat. § 505(b)(2)(i) and that the instructions given at Alvin's trial, like those given at LeCount's, were in accord with the language recommended by the Pennsylvania Suggested Standard Criminal Jury Instructions. *Le-*

## 4. Harmless error

The fact that an instruction may have been in error under state law does not, however, by itself establish a basis for habeas relief. *See Estelle v. McGuire,* 502 U.S. 62, 71–72, 112 S.Ct. 475, 116 L.Ed.2d 385 (1991). Federal courts on habeas review must consider "whether the ailing instruction by itself so infected the entire trial that the resulting conviction violates due process," *id.* at 72 (quoting *Cupp v. Naughten,* 414 U.S. 141, 94 S.Ct. 396, 38 L.Ed.2d 368 (1973)), which, in cases of trial court error such as this, requires a finding that the error " 'had substantial and injurious effect or influence in determining the jury's verdict.' " *Brecht v. Abrahamson,* 507 U.S. 619, 623, 113 S.Ct. 1710, 123 L.Ed.2d 353 (1993) (quoting *Kotteakos v. United States,* 328 U.S. 750, 776, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946)). *See also Henderson v. Kibbe,* 431 U.S. 145, 154, 97 S.Ct. 1730, 52 L.Ed.2d 203 (1977) (noting that "[a]n appraisal of the significance of an error in the instructions to the jury requires a comparison of the instructions which were actually given with those that should have been given"); *id.* at 154–55 (describing burden of demonstrating the prejudice of an erroneous instruction as habeas petitioner's); *id.* at 156 (considering other findings by jury as indicia of the significance of the omission in charge complained of by the petitioner). As the Third Circuit has explained:

Pursuant to the *Brecht* standard,

[t]he crucial inquiry is the impact of the error on the minds of the jurors in the total setting. It is thus inappropriate to ask whether there was sufficient evidence to support the result, apart from the phase of the trial affected by the error. The correct in-

---

count, 2006 WL 2540800 at *17 (R & R of Scuderi, M.J.). The district court noted that the self-defense instruction used in LeCount's trial had been approved by the Superior Court in *Alvin* and found that it "did not contradict the statutory language of 18 Pa. Cons.Stat. 505(b)(2)(I)" (sic). *Lecount,* 2006 WL 2540800 at *5. The court accepted that when considered in the context of the entire trial, LeCount had not suffered a due process violation nor could the state court's adjudication of his appeal be considered "contrary to federal law as established by the Supreme Court." *Id.* Accordingly, it denied habeas relief on this ground.

While we agree that the charge given in *Lecount* and at Pagliaccetti's trial was consistent with language approved in *Alvin,* we cannot find that observation to fully answer the question of whether there was error here. Regardless of whether the charge given "contradict[ed] the statutory language," *Lecount,* 2006 WL 2540800 at *5, we assess whether the charge given adequately conveyed what the statute required the Commonwealth to prove. Moreover, we note that the consistency of the charge given with the Superior Court's 1986 *Alvin* decision appears less relevant in light of the state Supreme Court's 1991 decision in *Samuel,* which demonstrated

the importance of the statutory requirement that the act of provocation be undertaken with a particular intent before the defendant would lose, on provocation grounds, the benefit of his assertion of self-defense.

In *Dunlavey v. Court of Common Pleas,* Civ. A. No. 02–3734, 2004 WL 1563012 (E.D.Pa. July 13, 2004), the petitioner also raised a claim that trial counsel was ineffective in failing to object to the jury charge regarding provocation and the "free from fault" language. *Dunlavey,* 2004 WL 1563012, at *2, *11. The court (Yohn, J.) noted the provisions of 18 Pa. Cons.Stat. § 505(b)(2), as well as the state supreme court's *Samuel* decision. However, it found that the charge given "contained language substantively indistinguishable from that articulated by the statute and by the Pennsylvania Supreme Court in *Samuel.*" *Id.* at *12, 590 A.2d 1245. Accordingly, it found that counsel's failure to object was justified. *See id.* at *13, 590 A.2d 1245 ("The jury charge accurately states the law of provocation and does not amount to error."). *But see also id.* (finding that even if error, no prejudice had been established). We take a different view of how distinguishable the charge language was from the standard articulated in the statute and recognized by the state supreme court in *Samuel.*

quiry is whether the error had a substantial influence on the verdict despite sufficient evidence to support the result apart from the error.

*Smith v. Horn,* 120 F.3d 400, 418 (3d Cir.1997) (quoting *Yohn v. Love,* 76 F.3d 508, 523 (3d Cir.1996)).

In addition to assessing the evidence before the jury, reviewing courts should consider the prosecutor's argument to the jury. *See id.* at 419 (observing that Commonwealth cannot argue that a theory that it emphasized in argument had no substantial or injurious effect). Moreover, with respect to errors in jury instructions in state prosecutions, the federal court on habeas review need not reach "absolute certainty" about the harmlessness of the error but rather must adhere to the *Brecht* iteration of harmless error. *See, e.g., Hedgpeth v. Pulido,* 555 U.S. 57, 58, 62, 129 S.Ct. 530, 172 L.Ed.2d 388 (2008) *(per curiam* ).[18] If a habeas court "is in grave doubt as to the harmlessness of an error," then it must grant habeas relief. *See California v. Roy,* 519 U.S. 2, 5, 117 S.Ct. 337, 136 L.Ed.2d 266 (1996); *O'Neal v. McAninch,* 513 U.S. 432, 437, 115 S.Ct. 992, 130 L.Ed.2d 947 (1995). *See also Whitney v. Horn,* 280 F.3d 240, 259–61 (3d Cir.2002) (finding erroneous instruction regarding voluntary intoxication harmless error where the evidence of defendant's mental state "was nothing short of overwhelming" when court considered defendant's rational actions in breaking into and while inside victim's apartment, number of stab wounds to victim's vital organs, and prior state-

ment by defendant evidencing specific intent to kill); *Phillips v. Diguglielmo,* 592 F.Supp.2d 809, 811 (E.D.Pa.2008) (Brody, J.) (finding any error in instruction regarding element of force necessary for robbery of motor vehicle conviction to be harmless "because there was overwhelming evidence for the jury to find that force was used to compel the owner to part with the motor vehicle" and "because the verdict would have been the same if the omitted instruction was given").

It is when we subject Pagliaccetti's claim to this *Brecht* harmless error analysis that we conclude that habeas relief should not be granted. Aside from the erroneous instruction about provocation, the Common Pleas Court specifically instructed the jury that the Commonwealth would have disproven Petitioner's assertion of self-defense if it established that Pagliaccetti did not have a reasonable belief that he was in immediate danger of death or serious bodily injury from Jason McFarland at the time he used force or that it was not reasonable, in light of all the circumstances known to him, for Pagliaccetti to have believed that he needed to use deadly force upon Jason to protect himself. The court also instructed the jury that the self-defense claim would be disproven if it found that Pagliaccetti knew that he could avoid the necessity of using deadly force with complete safety by retreating. (*See* N.T. 4/2/04 at 71–75.)

In its closing argument, the defense appeared to seek to reduce any offense of which Pagliaccetti would be convicted from

---

**18.** The Supreme Court has also noted that the assessment of harmless error under the *Brecht* standard is the appropriate test in the § 2254 context, regardless of whether or not the state appellate court recognized the error and reviewed it for harmlessness under the " 'harmless beyond a reasonable doubt' standard set forth in *Chapman [v. California],* 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705

[ (1967) ]." *Fry v. Pliler,* 551 U.S. 112, 121–22, 127 S.Ct. 2321, 168 L.Ed.2d 16 (2007). This decision put to rest the question of how § 2254(d)(1)—which looks to the unreasonableness of a state court determination—applied to cases of trial court error, as the Court explained that the *Brecht* standard "subsumes" the "AEDPA/*Chapman* " test.

first-degree murder and its guarantee of a life sentence. For example, defense counsel emphasized that voluntary intoxication could negate the specific intent to kill that is required for first-degree murder, which would reduce the case to third-degree murder. *See* N.T. 4/2/04 at 20–24. He also argued that the circumstances of the entire evening belied the notion that Pagliaccetti sought out to kill Jason McFarland. *See, e.g.,* N.T. 4/2/04 at 31 (noting that Pagliaccetti and girlfriend had been Christmas shopping earlier in the evening and were drinking with the McFarlands in the bar for several hours before Joseph McFarland cousin arrived to pick up his cousin and a dispute began); *id.* (referring to girlfriend's testimony about the events of the evening and arguing that "[t]here was no intent to kill anybody that night in that bar" and that, while Pagliaccetti should not have been carrying a gun to the bar, "he wasn't going there to kill somebody"). He also pointed out weaknesses in the account offered by the Commonwealth witnesses as to the injury that Pagliaccetti received to his eye and whether it was incurred after the shooting as opposed to before the shooting. *See, e.g.,* N.T. 4/2/04 at 27–28. While this line of argument supported the notion that Pagliaccetti had a reasonable belief that he had been assaulted by McFarland prior to the shooting and that he felt he was in danger of further harm, the defense did not attempt to provide a systematic analysis regarding the various elements in play in order for Pagliaccetti to successfully avoid all criminal responsibility for homicide on the grounds of self-defense.

In her closing argument, by contrast, the prosecutor argued that the Commonwealth had undermined the claim of self-defense in all three of possible ways—the unreasonableness of the belief that deadly force was necessary for self-protection; provocation by Pagliaccetti; and the avail-

ability of retreat—although she correctly noted that the jury need only find one of those criteria to be established in order to find Pagliaccetti guilty of murder. *See* N.T. 4/2/04 at 40 (prosecutor's closing argument that "[n]ow, there's three things that he has to have done in order to even have a self defense, but I submit to you it falls from the first one"); *id.* at 42–43 ("Only one of those has to fall, ladies and gentlemen, in order for self-defense to fall.... And I submit to you that every single one of them, even though I don't need to prove that, has been proven."). Her argument regarding the necessity of Pagliaccetti to have used deadly force against McFarland—the first element she addressed—was extensive:

... The defendant has to reasonably believe that he is in immediate danger of death or serious bodily injury from the other person, and he must reasonably believe it is necessary then and there to use the deadly force upon that person to protect himself. That's one.

... I submit to you it falls from the first one. And the standard isn't his standard, the standard is a reasonable person's standard, which you all are, and that's why you were picked.

Even by his own testimony nobody touched the man. Now he tells you at some point that he gets hit. He gets punched. That's not deadly force. You heard in the opening he was supposedly surrounded. We heard no evidence of that. None. How reasonable—you know what he says? This is what he says. He says I'm watching Jason. Now, Jason's his whole focus, as you know, 'cause that's who he's got this problem with. And he's going outside to make sure Jason gets in safely.

Well, if that's your purpose, then your eyes are on Jason, and you wanna make sure he's getting into that car, okay?

You're not gonna take your eyes off him if he's the person that you think is gonna come after you. Now, you've seen the pictures as to where the car is from where the bar is. You have to walk a few feet to get to [sic] from the front of the bar to the car. And he's telling you that he doesn't notice anybody coming up on the side of him, even though he's supposedly looking at Jason. That he hears somebody say something, and that he turns, and next thing you know, he's blind-sided.

That makes no sense. If you're out there to watch that Jason's safe, your eyes are on Jason. And then he says, then he says Jason walks away. So Jason runs up, punches him in the face, walks back to the car, and then he says—what does he say? I think or I thought he was going for something.

Well, I hear that every day. That's what you say when you're in his position. Car door wasn't open. It wasn't like he was reaching in the car. He was just— he just punched you in the face. If he wanted to shoot you all he had to do was put the gun up, put it to your head. That's what you say when you have nothing else to say, I submit to you. So I say to you, ladies and gentlemen, it falls right there.

(N.T. 4/2/04 at 40–42.) As to the question of whether Pagliaccetti violated a duty to retreat in a case of justification for use of deadly force, she argued:

And third, that the defendant violated a duty to retreat. And that's a special thing in the law that if you're gonna use deadly force against someone, unless it's

in your own home, you have a duty to retreat. All [Pagliaccetti] had to do was walk in the bar. No one was holding him. No one was attacking him. The person who had just punched him was 20 feet away by his own words at the car. You turn around. You walk in. That's not what he did. That's not what he did at all.

(N.T. 4/2/04 at 42.) The prong that she emphasized the least pertained to the challenged instruction, that is, that Pagliaccetti was not "free from fault" in provoking or continuing the difficulty between himself and McFarland that led to the shooting:

The second one is the defendant must be free from fault in provoking or continuing the difficulty that led to his use of deadly force. Now, we have that also. He provoked it. And he continued it by going out, instead of going back in that bar with his girlfriend where he belonged.

(N.T. 4/2/04 at 42.)

Having reviewed the record with care, we conclude that Petitioner has failed to establish that the erroneous instruction— which failed to convey the requirement of a specific intent on Pagliaccetti's part, in provoking or continuing a difficulty with McFarland, to employ deadly force—"had substantial and injurious effect or influence in determining the jury's verdict." *See Brecht v. Abrahamson,* 507 U.S. 619, 623, 113 S.Ct. 1710, 123 L.Ed.2d 353 (1993). We do not pretend that it is a simple matter to understand how the particular jury in this case determined the verdict as it did.[19] However, the claim of

---

**19.** During deliberations, the jury asked for the court to "re-read the difference of [sic] third degree [sic] and voluntary manslaughter," (N.T. 4/2/04 at 96), and the court complied by reading the law as it pertained to both of those offenses. (*See* N.T. 4/2/04 at 97–101.) The Commonwealth requested that the court

also reiterate its instruction on complete justification—e.g., to clarify that if it found that it was unreasonable for Pagliaccetti to believe that he needed to use deadly force in self-defense, then the jury should convict him of murder. In the absence of a request from the jury for further guidance, however, the court

self-defense was not a particularly credible one. Only Pagliaccetti offered any testimony that Jason McFarland made any show of force against him, and his account of Jason punching him in the eye unexpectedly while departing with his cousin Joseph does not seem plausible. To maintain some vestige of credibility before the jury, defense counsel did little to attempt to justify Pagliaccetti's actions on the ground of self-defense. *See, e.g.,* N.T. 4/2/04 at 21 (admitting in closing argument that "I'm not gonna stand here and tell you to believe every single word that was presented by the defense in this case. I wouldn't insult your intelligence like that. Because you know that somewhere in every conflict the truth is in the middle.") There was much evidence to support a finding by the jury that Pagliaccetti could have retreated from any show of force that had been made by Jason McFarland on the sidewalk simply, as the prosecutor suggested, by returning inside to the bar where his girlfriend had remained. In addition, there was little credible evidence that Pagliaccetti had any reasonable belief that Jason McFarland was about to seriously harm him when he allegedly saw him reaching into his waistband when he stood at his car with his two cousins nearby. Moreover, by Pagliaccetti's account, McFarland had just struck him in the face with his fist, and while many of the events of that alcohol-fueled evening defied logic, the prosecutor persuasively argued that Pagliaccetti's account that he feared Jason was going to shoot him was illogical: it would have made little sense for Jason McFarland to have punched Pagliaccetti in the face and then walked away to pull a gun on him from a distance of some 20 feet. Moreover, there was no corroboration of any kind of this rather weak claim

by Pagliaccetti that McFarland "looked like" he was reaching for "something" in his waistband and his fear that he was going to be shot. *See* N.T. 4/2/04 at 105. *See also id.* at 88–89 (testifying on direct that Jason McFarland punched him in the left eye and then "just took off in the other direction," and that Pagliaccetti pulled his gun and fired two shots when "it looked like [McFarland] reached for something").

There was much evidence before the jury from which it could find that, in pulling his loaded gun on Jason McFarland and after arguing with him earlier about an unsolved property crime against Pagliaccetti's sister, Petitioner intended either to kill Jason or to cause serious bodily injury. Pagliaccetti's claim to self-defense was fraught with pitfalls and would fail not only if the Commonwealth could show that he acted with the requisite provocation and intent to employ deadly force, but also if it established either that he did not pursue an available avenue of retreat or that he had no reasonable belief that he was at risk of Jason McFarland seriously injuring or killing him. The Commonwealth argued here that it established these elements as well, not just that Pagliaccetti was not "free from fault" in provoking or continuing the dispute. There was certainly much evidence from which the jury could find that the Commonwealth met its burden in either of those other regards. Because we find such convincing evidence that Pagliaccetti acted with malice and not in self-defense, we believe that the error with respect to the jury instruction on provocation was harmless under *Brecht.* Petitioner simply has not met his burden to show that the instruction had a substantial or injurious effect or influence in de-

declined to give them any further instruction or repeat the justification charge. (*See* N.T. 4/2/04 at 101–13.)

termining the jury's verdict in state court in 2004. Accordingly, there is no basis for the Court to provide Pagliaccetti with the relief requested in his counseled habeas petition.

## C. Ineffectiveness claim

In light of our determination that the error in the jury instruction was harmless, we do not find any basis for relief in Pagliaccetti's expression of this claim under *Strickland,* which requires him to demonstrate a reasonable probability that the result would have been different but for the professional errors. *Strickland v. Washington,* 466 U.S. 668, 691–96, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). Even if trial counsel could be said to have performed deficiently in not objecting to the "not free from fault" instruction that was given, Pagliaccetti has not sustained his burden of showing that he was prejudiced by counsel's performance, nor of the performance provided by counsel on direct appeal. As the Third Circuit noted in similar circumstances:

> [I]f [the petitioner] demonstrates that the erroneous instruction had a "substantial and injurious effect or influence in determining the jury's verdict," such that it was not harmless under *Brecht,* 507 U.S. at 637, 113 S.Ct. 1710, he has also demonstrated that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland,* 466 U.S. at 694, 104 S.Ct. 2052. He would also have paved the way to excusing the procedural default by establishing "cause." *See Coleman [v. Thompson ], supra* [501 U.S. 722, 111 S.Ct. 2546, 115 L.Ed.2d 640 (1991) ].

*Whitney v. Horn,* 280 F.3d 240, 258–59 (3d Cir.2002). For the same reasons set forth above as to the question of harmless error,

we find nothing unreasonable in the state court's determination on PCRA review that Pagliaccetti was not prejudiced by any deficient performance of counsel in this regard. We discern no reasonable likelihood that the result of the trial would have been different—e.g., that the jury would have acquitted Pagliaccetti of third-degree murder—had it received the correct instruction regarding provocation. Accordingly, we find no merit to Pagliaccetti's claim of ineffective assistance of counsel.

## III. CONCLUSION

As set forth in Section II.A above, it appears doubtful that equitable tolling could render the petition in this matter timely given what appears from the papers to be a case of "garden variety neglect" by Petitioner's retained counsel, as well as a lack of diligence by Petitioner in ensuring preservation of his right to review of his state court conviction under 28 U.S.C. § 2254. Rather than expend resources on an evidentiary hearing regarding any possible application of equitable tolling only for the court to later deny the petition, we have elected to consider the merits at this juncture. For the reasons set forth in Section II.B above, although we agree with Petitioner that the trial court did not properly charge the jury in his case, we conclude that this error was harmless when we apply the necessary *Brecht* standard. That is, we do not believe that "the error had substantial and injurious effect or influence in determining the jury's verdict." *Brecht v. Abrahamson,* 507 U.S. 619, 637, 113 S.Ct. 1710, 123 L.Ed.2d 353 (1993) (internal quotation omitted). For the same reason, the expression of this claim within an ineffectiveness challenge cannot give rise to relief. Accordingly, no relief is due in any event, whether the basis for relief is characterized as Due Process or Sixth Amendment right to counsel.

Inasmuch as we recommend that the petition be denied on the merits, obviating the need for resolution of Petitioner's claimed entitlement to a period of equitable tolling of the limitations period due to extraordinary circumstances created by Attorney Jokelson, we find there to be no need to appoint new counsel for Pagliaccetti as he requested for purposes of seeking to definitively establish his entitlement to equitable tolling of the limitations period. Accordingly, by separate order, we are denying Pagliaccetti's motion for appointment of counsel dated April 17, 2012.

Finally, pursuant to Local Appellate Rule 22.2 of the Rules of the United States Court of Appeals for the Third Circuit, we consider whether a certificate of appealability ("COA") should issue. A COA is appropriate where the petitioner demonstrates that jurists of reason would debate whether the petition states a valid claim for the denial of a constitutional right. *Slack v. McDaniel*, 529 U.S. 473, 484, 120 S.Ct. 1595, 146 L.Ed.2d 542 (2000). We recognize that jurists of reason have debated whether the due process claim asserted by petitioner here reflects a due process error. *See* note 17, *supra*, for a discussion of similar claims in cases before this district court. However, as we do not believe that jurists of reason would debate the question of the harmlessness of any error in this case, we do not find a reason for a COA to issue here. Our Recommendation follows.

### RECOMMENDATION

**AND NOW,** this 27th day of September, 2012, it is respectfully **RECOMMENDED** that the petition for a writ of habeas corpus be **DENIED WITHOUT AN EVIDENTIARY HEARING.** It is **FURTHER RECOMMENDED** that a certificate of appealability NOT issue as to the due process claim based upon trial court error in the jury instructions in light of our finding of no more than harmless error.

Petitioner may file objections to this Report and Recommendation. *See* Local Civ. Rule 72.1. Failure to file timely objections may constitute a waiver of any appellate rights.

·In light of Petitioner's request for the appointment of counsel and his reported breakdown in communications with present counsel, the Clerk is directed to serve Petitioner with a copy of this Report and Recommendation at the address of the State Correctional Institution indicated on the habeas petition.

September 27, 2012.